IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2023 Session

**STATE OF TENNESSEE v. KELVIN MONTGOMERY**

**Appeal from the Criminal Court for Shelby County**
No. 14-06509    Paula L. Skahan, Judge
_____

**No. W2022-01160-CCA-R3-CD**
_____

The Appellant, Kelvin Montgomery, was convicted of especially aggravated kidnapping and aggravated sexual battery. The trial court imposed an effective sentence of thirty-seven years' confinement. On appeal, the Appellant argues that: (1) the evidence is insufficient to support his convictions; (2) the trial court committed plain error by failing to provide the jury instruction required under State v. White, 362 S.W.3d 559, 580-81 (Tenn. 2012), in connection with his aggravated rape charge; and (3) the trial court abused its discretion by imposing the maximum within-range sentences and ordering that they be served consecutively. Upon our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Lance R. Chism, Memphis, Tennessee (on appeal) and Shae Atkinson, Memphis, Tennessee (at trial), for the appellant, Kelvin Montgomery.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Steve Mulroy, District Attorney General; and Eric Christensen and Carrie Shelton-Bush, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On June 15, 2014, the victim, A.T.,[1] encountered the Appellant at the Half Shell restaurant where she worked. After the two consumed alcohol for a few hours at the Half Shell and then at the Fox and the Hound restaurant, the Appellant took the victim to his

_____
[1] It is the policy of this court to identify victims of sexual offenses by their initials only.

house. According to the victim, the Appellant then handcuffed her, gagged her with a ball gag, and raped her. During the rape, he repeatedly punched her, strangled her, and told her she was going to die. When he fell asleep, she escaped and ran, while naked, to a nearby house for help. According to the Appellant, the victim voluntarily came to his house and he did not have sex with her.

In November 2014, the Shelby County Grand Jury indicted the Appellant for attempted first degree murder, especially aggravated kidnapping, and aggravated rape. On July 1, 2016, the Appellant entered a guilty plea to attempted second degree murder, aggravated kidnapping, and rape. The trial court, however, deferred execution of the plea and permitted the Appellant to travel to Hawaii. The Appellant failed to appear in court for execution of the plea. Four years later, the Appellant was extradited from Georgia to Shelby County. The Appellant withdrew his guilty plea and proceeded to trial.

**Trial**. The Appellant's four-day trial began on April 26th, 2022. The proof relevant to the issues raised on appeal is summarized below. Natasha Huggins testified that she and the victim worked at the Half Shell on June 15, 2014. The victim's shift ended at 9:00 p.m., but the victim stayed and had some drinks at the bar. While Natasha[2] was still working, she noticed the victim talking to a man later identified as the Appellant. The Appellant was "kind of hovering over [the victim]" and "something just told [Natasha] to keep watching [the victim]." She agreed, however, that she told the police that the victim was "all over him" and "kissing on him." When Natasha's shift ended around 12:00 or 12:30 a.m., she asked the victim to come outside with her because she had just received bad news. The victim seemed intoxicated, but was "totally coherent." Natasha asked the victim what she was doing with the Appellant, and the victim said she did not know. Natasha was unable to identify the Appellant.

Natasha said she and the victim went back inside and sat with Natasha's then-boyfriend Christian Huggins. The victim asked Natasha to go to the Fox and the Hound, and Natasha refused. The Appellant came over and started asking Natasha personal questions, and she told him to leave her alone. She asked the victim to go to the bathroom with her. The victim again asked her to go to the Fox and the Hound, and she refused. Believing that the victim was too intoxicated to drive, she asked the victim to come home with her instead. The victim agreed and gave Natasha her keys. They went back to the bar, and the Appellant asked Natasha "why [she was] being a [b]***h." Natasha "went off on him" and the bartender separated the two of them. The victim went to the other end of the bar where the Appellant was.

---

[2] Because Natasha Huggins and Christian Huggins share the same last name, we will refer to them by their first names. We intend no disrespect in doing so.

Natasha said she realized a few minutes later that the victim was gone.  Since the victim was supposed to go home with her, she jumped up and ran outside.  The Appellant was trying to put the victim in his truck.  Though the victim was "totally fine" a few minutes prior, she could not get in the truck without assistance.  Her speech was slurred.  Natasha started trying to pull the victim out of the truck, telling the victim that she needed to come home with her.  The Appellant began yelling and cursing at Natasha.  Christian and a security guard came over, and the Appellant acted like he was going to fight Christian.  Natasha had to walk away, but got the Appellant's license plate and tag number.  The Appellant left with the victim.

On cross-examination, Natasha acknowledged that she did not mention in her statement to the police that the Appellant was trying to force the victim into his truck.  The Appellant and the victim were both already in the truck when Natasha came outside.  When she tried to get the victim out of the truck, the victim told her she would see her at the Fox and the Hound.  When the Appellant drove away, Natasha did not call the police or follow them to the Fox and the Hound.

Christian Huggins testified that he arrived at the Half Shell after midnight.  When he arrived, Natasha and the victim were outside smoking cigarettes.  The victim had consumed a couple of drinks, but was "fine."  The victim went inside, and a couple of minutes later, Christian and Natasha followed.  Christian and Natasha sat at the end of the bar, and the victim came over to talk to them.  The Appellant quickly followed and tried to involve himself in their conversation.  Natasha was upset and told the Appellant to leave her alone.  Natasha and the victim went to the bathroom, and the Appellant started talking to Christian.  When Natasha and the victim returned, the Appellant asked Natasha why she was "being such a [b]***h[.]"  Natasha and the Appellant argued, and the bartender separated them.  The victim walked off.

Christian said Natasha was concerned that the victim may have left with the Appellant, so she ran outside.  Christian followed and saw Natasha trying to pull the victim out of the Appellant's truck.  The Appellant tried to convince Natasha that he was a "good guy" and that they were just going to another bar.  The victim's "demeanor had completely gone downhill [] since [Christian] had been there."  Christian told the Appellant that the victim was "wasted" and needed to go home.  The Appellant "bowed up" to Natasha and Christian.  Christian tried to convince the victim to get out of the truck, but she "[was not] even using full sentences."  He backed off because he did not want to fight the Appellant.

Christian said that he did not see any displays of affection between the victim and the Appellant throughout the night.  He described the Appellant's behavior as odd and said the Appellant would not let the victim out of his sight.  When Christian first arrived at the Half Shell, the victim was fine, but after returning from the bathroom she "flipped a switch

and [] was incoherent." He acknowledged on cross-examination that when the Appellant left with the victim, he did not call the police or follow them.

The victim testified that when her shift ended at the Half Shell, she stayed and had some drinks. She ordered a beer and a shot and just wanted to be alone, but two men at a table behind her "were trying to [] hang out." When her friend and co-worker Kelly's[3] shift ended, she and Kelly sat down with the two men. One of the men, the Appellant, told her his name was "R.J." The other man was his roommate. The victim had another beer and shot with Kelly. The Appellant left to take his roommate home.

The victim said when the Appellant and his roommate left, she went to sit with her friends. The Appellant returned and started talking to her and other individuals at the bar. The victim was on her fourth drink. The Appellant bought her a Fireball shot. Natasha wanted to talk to the victim privately about something personal, so they went outside to smoke. When they came back inside, the victim told the bartender she wanted her check so she could leave. The Appellant kept buying her shots, even though she said that she wanted to leave. At some point, he asked her if she would come back to his house. She was offended and told him "if [he] wanted to see [her] further[,] [he] can take [her] out on a proper date." Kelly left because the Appellant "grabbed her breast and acted like it was an accident."

The victim said that the Appellant bought her another shot, which she declined. She went to the bathroom. When she returned, she took the shot hoping that he would "get off [her] back" and then told him that she was done. She signed her check. A check reflecting the victim's employee discount was introduced into evidence. It was closed at 1:42 a.m. and signed by the Appellant. The victim said when she got up to leave, her legs were "very heavy" and she "was just paralyzed." She realized she should not be driving. The Appellant said she should ride with him, and Natasha and Christian would meet them at the Fox and the Hound. She did not intend to go anywhere alone with the Appellant. When asked whether she went to the parking lot on her own, she responded that it was "fuzzy." She remembered "feeling very strange" and "not being able to move [her] limbs [.]" She was trying to tell Natasha that she did not want to go with him, but Natasha could not understand what she was saying. The Appellant shoved Natasha out of the way, and Christian came over. The Appellant slammed the door and pulled off.

The victim said the Appellant took her to the Fox and the Hound, and he had to help her walk inside. Her memory of the Fox and the Hound was "fuzzy," but she believed that the bartender would not serve them. The Appellant told her he was going to take her to her

---

[3] Because Kelly's last name does not appear in the record, we will refer to her by her first name. We intend no disrespect in doing so.

home. After they left, she realized she was in danger. She told him that they were not driving toward her house, and he responded that they were going to stop by his house for a minute, which she did not want to do. She could not move and did not know how he got her in his house.

The victim's next memory was sitting on the edge of the Appellant's bed. The Appellant pulled out some handcuffs, came toward her, and said, "[D]o you want to try these on, [b]***h [?] [Y]ou'll like this, won't you?" Everything went dark. When she "came to," her hands were cuffed behind her back and she was lying on the bed naked. The Appellant was on top of her, punching and raping her. He said, "I tell you all the time, you don't listen you stupid f*****g [b]***h, you're never going to f*****g learn until you're dead." His hands were around her neck, choking her. She would lose consciousness, and when she regained consciousness he would be "giggling and laughing" and saying, "You'll never see [your kids] again, [b]***h." He would let her breathe, then choke her again. Her legs started shaking, and she thought that "pretty soon [she] wasn't going to be able to come back[.]" At some point, she woke up with a ball gag on, and he told her to "shut the f**k up and die." When she told him to stop, he would hit her more. He kept laughing and telling her, "You're not going to live." When she regained consciousness the last time, he was no longer on top of her. She heard him snoring, and she laid there with her eyes closed "for a long time" to make sure he was asleep enough that he would not wake up when she tried to leave.

The victim said she ran to the door, still naked, handcuffed, and with a ball gag on. She unlocked the door and took off running. She ran to several different houses, banging her head on the doors. Eventually, a couple let her inside. At first, they told her they could not help her. She told them she had nowhere to go, and the Appellant was going to kill her on their porch. They opened the door, let her inside, and called the police. The police arrived and took pictures of the victim, which were entered into evidence. She had to get in the police car and show them the house where she was attacked. As they drove by the house, she was crouched down in the floorboard, scared that the Appellant was going to kill them.

On June 16, 2014, the victim was shown a photographic lineup and identified the Appellant as the person who raped her. The lineup was entered into evidence. Pictures taken by the victim's mother a couple of days after the rape were also entered into evidence. The pictures showed red marks in her eyes, bruising around her left eye, and marks on the inside and outside of her lip. They also showed marks on her neck, cuts and bruising on her wrists and arms, and bruising on her right hip. The victim said she had blood all over her. She did not give the Appellant permission to do any of the things that happened that night and did not want to be at his house.

On cross-examination, the victim said she did not remember kissing the Appellant at the Half Shell, but someone told her she did. She acknowledged that she did not try to leave the Half Shell when the Appellant left to take his roommate home. She drank three Coors Lights, three Fireballs, and a couple of shots that the Appellant gave her. She said that she could not talk or move because the Appellant put something in her drink. She did not know what he put in her drink, but she remembered his being adamant that she drink it. She reiterated that she did not want to go with the Appellant, but agreed that she would have had her purse and cell phone with her in the Appellant's truck. She agreed that she was not forced to stay in his car, she just could not physically get out of it.

James Riggs testified that at approximately 4:30 or 5:00 a.m. on June 16, 2014, his wife woke him up and told him there was a woman banging on their door who looked like she needed help. He looked out the window and saw a naked woman with her hands cuffed behind her back and some type of ball around her neck. She looked like she had been beaten up. He grabbed his gun and opened the door. A car stopped on the road, and she said, "That's him, that's him, he is going to kill me." She ducked behind a van in the driveway, and he told her to come inside. When she came inside, he heard the car drive away. He called the police. The woman was "really scared" and kept repeating, "He just kept laughing at me."

Officer Matthew Charles testified he responded to a call on June 16, 2014, about a suspicious woman handcuffed with a ball gag around her neck. When he arrived, she was "hysterical" and told him that a man sexually assaulted her. She met the man at the Half Shell, and they went to the Fox and the Hound, and then to his house. When they got to his house, he struck her and began to sexually assault her. He kept telling her that he was going to kill her. When he passed out, she ran out of the house. Officer Charles took photographs of the woman. As they drove to the Rape Crisis Center, the woman pointed to the house where the sexual assault occurred. She was afraid to drive by, and cowered down inside of the police car. Sergeant Jason Parish testified that he took alternative light source pictures, which show bruising beneath the skin that had not yet become visible, of the victim's neck at the Rape Crisis Center. The pictures, which were entered into evidence, showed bruising consistent with being choked.

Officer Charles Cathey testified that he photographed the Appellant's house and recovered evidence. The pictures, which were entered into evidence, showed the victim's clothing on the bedroom floor. The victim's purse was in the bedroom closet floor, under some clothing. There were two small blood stains on the bed sheets, and two small blood stains on the pillow. Agent Lawrence James testified that the DNA from the blood on the sheets was consistent with the victim's DNA profile. No semen was found in the swabs from the victim's sexual assault kit.

- 6 -

Sally Discenza, a sexual assault nurse examiner, testified that she examined the victim the morning of June 16, 2014. She took pictures, which were entered into evidence, of the victim's injuries. She described bruising and swelling around the victim's left eye and petechiae on her face, which is caused by strangulation. The victim had bruising on her lip and abrasions under and inside of her lip. These facial injuries were consistent with the victim having been punched and having a ball gag in her mouth. The victim also had abrasions and swelling around her wrists consistent with having been handcuffed. The victim had bruising on the top of her right leg next to her genital area, bruising and abrasions on her knees, and a large laceration on her left shin.

Nurse Discenza testified that the victim had a blood alcohol level of .1. She did not find the "date rape" drugs GHB or Rohypnol in the victim's blood. GHB is typically eliminated from the body within two to six hours, while Rohypnol remains in the body for three to five days. The victim's symptoms of feeling unable to move and sluggish were consistent with GHB consumption or alcohol consumption. The victim also had Effexor in her system, the side effects of which can be exacerbated by alcohol consumption. In addition, strangulation can cause periods of blackouts. Nurse Discenza examined the alternative light source pictures of the victim's neck and said the bruising was consistent with strangulation. Because the neck is protected by the jaw line, the bruising is unlikely to have resulted from a fall. She said ten to fifteen seconds of pressure on a person's neck can cause unconsciousness, and two minutes of pressure can cause death. She examined the pictures showing red marks in the victim's eyes a couple of days after the incident and said the redness was consistent with the victim having been strangled the morning of June 16, 2014.

After the State rested, the defense presented four witnesses. Lieutenant Sharon Birk testified for the defense that she spoke with the victim at the Rape Crisis Center. The victim told her that after leaving the Half Shell, she and the Appellant went to the Fox and the Hound and were drinking. She went back to his house, and he asked her to go into the bedroom. She went into the bedroom with him, and he immediately started hitting her and threw her down on the bed.

Chelise Promisel testified that she was a bartender at the Fox and the Hound in June 2014. She did not remember whether she worked on June 15, 2014, and did not know the Appellant or the victim. If a customer were too intoxicated, she would not serve them, tell her manager, and try to find them a way home. She did not remember any such event happening in June 2014.

Matthew Wilson testified that he lived with the Appellant in June 2014. One night, he rode with the Appellant to the Half Shell and had dinner. He was there for approximately two hours. The victim and the Appellant were "having a good time" and

engaging in "casual conversation." The victim was moving around the restaurant and did not stay at their booth the entire time. The Appellant drove Wilson home. They lived in a single story, 1,700 square feet house that "[echoed] like a museum." Wilson did not consume alcohol at the Half Shell, but he consumed a "[c]ouple hundred milliliters" of moonshine when he got home. He went to sleep around 1:00 a.m. The door to his room was "probably [open]" so the cat could move "in and out of the room." He was not awakened at any point during the night. The only noise he heard was the Memphis Police Department at 6:00 a.m. On cross-examination, he acknowledged that he initially refused to speak to police without a lawyer.

The Appellant testified that he went to the Half Shell with Wilson on June 15, 2014. They sat at a booth in the bar area, and Kelly was their waitress. He ordered "a Corona and a shot of Jack." The victim told him he should try the "Midas Touch" drink, and slid into the booth. She offered to let him try her drink and started rubbing on his inner thigh. They talked about "normal meeting stuff" like friends and family. At some point, they went outside to smoke. The victim asked the Appellant to hold her cigarette, went inside, and came back out with a drink. She drank half of it and gave the rest to him. She then started "pushing up and [] kissing on [him]." They went back inside and Wilson wanted to leave, so the Appellant left to take him home. The victim told the Appellant that "[he] better come back." She took his phone and called her phone to exchange phone numbers. He left at approximately 10:30 p.m. and came back at 11:00 p.m.

The Appellant did not see the victim when he returned to the Half Shell. As he ordered a drink, she ran up and "[put] her arm around [his] elbow[,]" and they went outside. They were "smoking and making out[.]" Natasha came outside, and the victim said she needed to talk to Natasha privately. The Appellant went back inside and sat next to a woman named "Toya."[4] The victim, Natasha, and another man came inside fifteen to thirty minutes later. The victim and the Appellant both ordered a glass of wine. The victim "[started] making some rude comments" to Toya and "making a scene." The victim left, took the Appellant's wine, and went to talk to another man. At some point, she went to sit with Natasha and Christian. The victim got upset when the Appellant told Toya he would pay Toya's bill, so he paid the victim's bill too. The manager closed the Half Shell at 2:00 a.m., an hour early, because of the victim's altercation with Toya.

When the Appellant said he was going to the Fox and the Hound, the victim said, "[Y]ou ain't going anywhere without me." She had been "all over [him] the whole night." They went to his truck and, as he was backing out, Natasha, Christian, and a security guard came outside. Natasha was running at his car, so he stopped and rolled the window down.

---

[4] Because Toya's last name does not appear in the record, we will refer to her by her first name. We intend no disrespect in doing so.

She jumped through the window and started jerking on the inside handle trying to open the door. He got out and asked her "what in the hell [was] [her] problem." Natasha was trying to get the victim to come with her, and the Appellant said, "she's an adult, y'all can figure that out." He gave the security guard his driver's license and handgun permit and told Natasha to take a picture of his car tag if she wanted to. After ten to twenty minutes, he asked the victim if she was coming with him and she responded yes. He drove the victim to the Fox and the Hound.

The Appellant said when they got to the Fox and the Hound, the victim did not want to go inside. After "kissing and making out for a minute," she agreed to go inside. They stayed and had drinks for a while. The victim "[got] into it" with the bartender Chelise and went outside. Five minutes later, the Appellant went outside and found the victim sitting on the trunk of a car. The owner of the car came out and got into an argument with the victim. The victim pushed the man and ran off. The Appellant apologized to the man. The Appellant went inside to pay the tab at approximately 3:35 a.m. and told Chelise he was going to drop off the victim at her car and come back. He took the victim back to the Half Shell and asked where her car was. She responded, "[Y]ou're stuck with me tonight" and told him she left her keys with the bartender.

The Appellant drove the victim to his house. The victim went to the bathroom, then to his bedroom. He showed her pictures of his children and their mother, and she said, "I don't want to see your whore." Since they had talked about "sexual preferences" at the Half Shell, she asked to see his "toy bag." He went to get it, and when he came back she was "buck-naked on the bed, playing with herself." He gave her the toy bag and went to make them drinks. When he returned with the drinks, she wanted to "role play [] like [he was] a cop." He "[patted] her down" and handcuffed her. When he put the ball gag in her mouth, she said no so he pulled it down around her neck. She jumped on the bed and asked if he was ready. He told her he was not in the mood, and she demanded that he perform oral sex on her. When he refused, she "[flipped] out [] in a rage." She "thrust herself" off the bed and "[flopped] around on the floor." He got her back on the bed and tried to remove the handcuffs. While he was looking for the key, she walked to the front door. When he asked where she was going, she said, "I'm scared and I'm leaving." He responded, "[Y]ou got that right, but not like this." He took her to the bedroom and went to his truck to look for bolt cutters. When he came back inside, she was gone. He went looking for her but did not find her. He went to an industrial building he owned and fell asleep on the couch in an office.

The Appellant said the victim "was drunk and belligerent . . . but it wasn't no [GHB] or [Rohypnol] . . . it's just plain, stupid drunkenness." On cross-examination, the Appellant acknowledged that his testimony differed, at least in part, from the testimony of all of the other witnesses. He reiterated that he did not have sex with the victim. He was "pretty

sure" the bruise on the victim's leg near her genital area was from her falling off the bed. He thought the bruise on her neck may have been from his sucking on her neck at the Half Shell. He acknowledged that he was in the Fulton County jail for twenty-five days because he had an outstanding warrant in Shelby County. He alleged that his attorney told him to flee. Deputy Bobby Phillips testified for the State that the Appellant was extradited from Georgia on August 25, 2020.

At the conclusion of trial, the jury acquitted the Appellant of attempted first degree murder and aggravated rape, and convicted him of especially aggravated kidnapping and the lesser included offense of aggravated sexual battery.

**Sentencing Hearing**. At the sentencing hearing, the trial court sentenced the Appellant as a Range I offender to an effective sentence of thirty-seven years' confinement. The victim and the Appellant testified at the hearing. A woman, whom the Appellant allegedly raped after he fled Shelby County in 2016, S.N., also testified. Prior to S.N.'s testimony, the State explained that while S.N. was on the Appellant's boat in the Gulf of Mexico, the Appellant pushed S.N. off of the boat. The State said that the Appellant allowed her back on the boat only after she promised she would not complain anymore, and then "struck her," "kicked her in the ribs," "choked her out with his forearm," and "raped her." At some point, she called the police. The police arrested the Appellant on gun charges. S.N., however, did not testify to any of these facts. S.N. testified that the Appellant is "not capable of remorse" and "will hunt again" when he is released. She said that it had "taken a long time for [her] to fully understand everything that [she] endured during the time [she] spent as [the Appellant's] prisoner" and she "will never fully recover from that experience." She requested that the court "protect future women" by "keeping [the Appellant] off the streets."

S.N. also testified that she accompanied the Appellant to a court appearance, thinking it was for a traffic ticket. While she and the Appellant were in the car, the Appellant pointed at a woman and asked her "if [she] would be interested in having a threesome with her." She later learned the girl was the victim, and that the court appearance was not for a traffic ticket.

The victim testified that she "lived the past [eleven] years in fear" and that her children did not get to have the mother they deserved because of the damage the Appellant caused her. She stated that she "can begin to heal if [she] [knows] that [the Appellant] can't kill and rape or torture another woman for the rest of his life."

The Appellant testified and insisted that he was innocent. He claimed that the bruises depicted in the pictures taken a couple of days after the incident "could have [come] from anywhere and everywhere." The pictures taken hours after the incident show "barely

a mark on her." He complained about the fairness of his trial and his attorney's representation. The court interjected and said, "I'm going to stop you. . . . [T]his is just not appropriate and it's just ridiculous."

The trial court applied enhancement factors (1) and (8) to both of the Appellant's convictions. In applying factor (1), the court noted that the Appellant had a lengthy criminal history beginning in 1997. The pre-sentence report, which was admitted as an exhibit to the hearing, shows that the Appellant had five prior misdemeanor convictions, eleven misdemeanor charges that did not result in conviction, and a 2018 felony conviction for being a convicted felon in possession of a weapon. The State advised that the 2018 offense was listed incorrectly and was actually for possession of a weapon while on bond. The court found factor (8), that the defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community, applicable because the Appellant "fled the jurisdiction for years."

The court also applied enhancement factors (5), (6), and (7) to the Appellant's aggravated sexual battery conviction. The court found factor (5), that the defendant treated a victim with exceptional cruelty during the commission of the offense, based on the "handcuffing, the ball gag in the mouth, the choking to the point of unconsciousness, the slapping, [and] the taunting[.]" The court found factor (6), that the personal injuries inflicted upon the victim were particularly great, applicable based on the choking and "horrible beating[.]" In applying factor (7), that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, the court said the Appellant's actions "went way beyond anything this [court has] ever seen on an aggravated sexual battery."

After considering the presentence report, the evidence at the trial and the sentencing hearing, and the above enhancement factors, the court sentenced the Appellant to the maximum within-range sentences—twenty-five years for the especially aggravated kidnapping and twelve years for the aggravated sexual battery. The court noted that this was "an incredibly horrible[,] nightmare attack on [the victim]" and the Appellant also brutally attacked S.H. in Alabama. In assessing the Appellant's potential for rehabilitation, the court noted that the Appellant had been on probation previously and a violation of probation warrant was issued. He also had numerous public intoxication charges.

The court then ordered that the sentences be served consecutively. The court found that the Appellant was both: (1) an offender whose record of criminal activity is extensive; and (2) a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(2), (4). The court noted that the Appellant handcuffed the victim, gagged her with a ball gag, beat her, and choked her. The court also found that

the Appellant threw S.N. overboard on his boat, then raped and beat her. The court found that the Appellant's behavior "has shown absolutely no respect for anyone except himself" and he "has refused to acknowledge that he has done anything wrong." The court found consecutive sentencing appropriate because "if [the Appellant] were to be let out even at 80 [years old], [] he would harm [women] at that point."

The Appellant filed a timely motion for new trial, which the trial court denied. The Appellant thereafter filed a timely notice of appeal.

## ANALYSIS

I. **Sufficiency of the Evidence**. The Appellant argues that the evidence is insufficient to support his convictions of especially aggravated kidnapping and aggravated sexual battery. The State responds, and we agree, that the evidence is sufficient to support the convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

A. **Especially Aggravated Kidnapping**. As charged in this case, "[e]specially aggravating kidnapping is false imprisonment . . . [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305(a)(4). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a). Serious bodily injury is an injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or

- 12 -

obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.  Id. § 39-11-106(37)(A)-(E).

The Appellant argues that the victim "voluntarily accompanied" him to the Fox and the Hound and to his house.  He argues that no reasonable juror could have accredited the victim's testimony because she was highly intoxicated, and her testimony was inconsistent with Wilson's testimony.  The credibility of witnesses, however, was a question for the jury.  See Campbell, 245 S.W.3d at 335.  Viewed in the light most favorable to the State, the proof at trial established that the Appellant took the victim to his house against her will and confined her to the bedroom.  The victim testified that when they left the Fox and the Hound, the Appellant told her he was going to take her home.  Instead, he took her to his house.  She did not want to go to his house.  Her next memory was sitting on the Appellant's bed, where he handcuffed, punched, strangled, and raped her.  The victim had bruising on her neck and petechiae on her face and eyes consistent with strangulation.  She also had bruising on her face consistent with being punched, and abrasions and bruising around her wrists consistent with being handcuffed.  When she regained consciousness and realized the Appellant was asleep, she ran out of the house to seek help.  She was still naked, with her hands cuffed behind her back and a ball gag around her neck.  Based on these facts, a rational jury could have found that the Appellant falsely imprisoned the victim.

Alternatively, the Appellant argues that there is insufficient proof that the victim sustained serious bodily injury.  Viewed in the light most favorable to the State, however, the proof at trial established that the victim suffered protracted unconsciousness.  The victim described the Appellant's strangling her until she was unconscious, allowing her to regain consciousness, and then strangling her until she was unconscious again.  This series of events continued repeatedly throughout the attack.  When the victim regained consciousness the final time, the Appellant was no longer on top of her and had fallen asleep.  Based on these facts, a rational jury could have found that the victim's unconsciousness was protracted.  See State v. Neblett, No. M2011-02360-CCA-R3-CD, 2012 WL 4841322, at *11 (Tenn. Crim. App. Oct. 9, 2012), perm. app. denied (Tenn. Jan. 22, 2013) (holding that the evidence was sufficient to establish protracted unconsciousness when the victim was "in and out of consciousness" and could not remember what happened after he was hit).  Accordingly, the evidence is sufficient to support the Appellant's especially aggravated kidnapping conviction.

**B. Aggravated Sexual Battery**.  As charged in this case, aggravated rape is "unlawful sexual penetration of a victim by the defendant . . . [where] [t]he defendant causes bodily injury to the victim."  Tenn. Code Ann. § 39-13-502(a)(2).  The jury, however, acquitted the Appellant of aggravated rape and convicted him of the lesser included offense of aggravated sexual battery.  Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant . . . [where] [t]he defendant causes bodily

injury to the victim." Id. § 39-13-504(a)(2). Sexual contact is "the intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock, or breast of a human being." Id. § 39-13-501(2).

The Appellant argues that there is no evidence that he had unlawful sexual contact with the victim. He contends that the only alleged sexual contact was the penetration underlying the aggravated rape charge, of which the jury acquitted him. Viewed in the light most favorable to the State, however, the proof at trial established that the Appellant unlawfully penetrated the victim's vagina with his penis. The victim testified that the Appellant penetrated her vagina with his penis while punching, strangling, and threatening her. She testified that none of these events were consensual. The fact that the proof is sufficient to support the greater offense of aggravated rape, for which the Appellant was acquitted, does not render the proof insufficient to support the lesser included offense of aggravated sexual battery. See State v. Vance, No. 01C01-9610-CC-00425, 1997 WL 749445, at *6 (Tenn. Crim. App., at Nashville, Dec. 3, 1997), perm. app. denied (Tenn. Sept. 21, 1998) (affirming the defendant's aggravated sexual battery conviction when the proof showed penetration because "a jury is allowed to extend mercy to a defendant by finding him guilty of a lesser offense, even in the face of proof that he is guilty of the greater offense."). Accordingly, the evidence is sufficient to support the Appellant's aggravated sexual battery conviction.

**II. White Instruction**. The Appellant argues that the trial court erred by failing to provide the jury instruction required under State v. White, 362 S.W.3d 559, 580-81 (Tenn. 2012), in connection with his aggravated rape charge. He concedes that this issue was not raised at trial or in his motion for new trial and requests relief under the plain error doctrine. The State responds that the Appellant has not demonstrated that relief is necessary to do substantial justice because "it is readily apparent that [the victim's] confinement was longer than necessary to commit the aggravated sexual battery," and the court provided a White instruction in connection with the attempted first degree murder charge. We conclude that the Appellant has not established that he is entitled to relief under the plain error doctrine.

In White, the Tennessee Supreme Court held that the kidnapping statutes were not intended to apply to "a removal or confinement of a victim that is 'essentially incidental' to that of an accompanying felony, such as rape or robbery." White, 362 S.W.3d at 581. To ensure defendants are afforded constitutional due process, the trial court must, therefore, instruct the jury to determine whether the removal or confinement "is independently significant from an accompanying felony." Id. at 578. In making this determination, the jury should consider the following non-exhaustive list of factors:

• the nature and duration of the victim's removal or confinement by the defendant;

• whether the removal or confinement occurred during the commission of the separate offense;

• whether the interference with the victim's liberty was inherent in the nature of the separate offense;

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81.

In this case, the trial court provided a White instruction, but only in connection with the attempted first degree murder charge. The trial court instructed the jury that "[t]o find the defendant guilty of [especially aggravated kidnapping], you must also find that the removal or confinement was to a greater degree than that necessary to commit the offense(s) of Criminal Attempt: First Degree Murder as charged in Count One." The Appellant challenges the omission of aggravated rape from the instruction for the first time in this appeal. Accordingly, we are limited to reviewing the alleged error under the plain error doctrine. See Tenn. R. App. P. 36(b).

The plain error doctrine provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Id. An error is "plain" if the Appellant establishes each of the following factors:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did

- 15 -

not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The Appellant must also establish that the error was "'of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

The Appellant failed to establish that consideration of the error is necessary to do substantial justice or that the error probably changed the outcome of the trial. Based on the proof presented at trial, the especially aggravated kidnapping was not essentially incidental to the aggravated sexual battery. The kidnapping began when the Appellant left the Fox and the Hound with the victim. He told her that he would give her a ride to her house, but instead took her to his house. These actions reduced his risk of detection and reduced the victim's ability to summon assistance. The kidnapping continued after the aggravated sexual battery was complete, as the victim remained handcuffed, gagged, and confined to the bedroom. Only after the Appellant fell asleep did she manage to unlock the door with her hands still cuffed behind her back and escape. Therefore, the Appellant is not entitled to relief under the plain error doctrine.

**III. Sentencing**. The Appellant argues that the trial court abused its discretion by imposing the maximum within-range sentences and ordering that he serve them consecutively. The State argues, and we agree, that the trial court acted within its discretion.

**A. Length of Sentences**. The Appellant contends that because only one of the five enhancement factors in this case was properly applied, the trial court's imposition of the maximum within-range sentences was an abuse of discretion. The State responds that four of the five enhancement factors were properly applied, and even a single enhancement factor is sufficient to justify the maximum within-range sentences. Though we conclude that the trial court misapplied enhancement factors (7) and (8), the court did not abuse its discretion in sentencing the Appellant to the maximum within-range sentences.

We review a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The appealing party bears the burden of establishing that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sent'g Comm'n Cmts. So long as the statutory purposes and principles, along with any

applicable enhancement and mitigating factors, have been properly addressed, the sentence should be upheld. Bise, 380 S.W.3d at 706. Even the misapplication of an enhancement or mitigating factor, however, "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id.

In sentencing a defendant, the Sentencing Act directs the trial court to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b). The court shall impose "a sentence justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1). The court must consider the defendant's potential for rehabilitation or treatment. Id. § 40-35-102(3)(C), -103(5). In addition, the sentence must be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

The trial court applied enhancement factors (1) and (8) to both of the Appellant's convictions. In addition, the court applied factors (5), (6), and (7) to the Appellant's aggravated sexual battery conviction. The Appellant contests the application of each of the factors, with the exception of factor (1), that he had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. See Tenn. Code Ann. § 40-35-114(1).

- 17 -

The Appellant argues, and the State concedes, that the trial court misapplied factor (7), that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, to his aggravated sexual battery conviction. See Tenn. Code Ann. § 40-35-114(7). The trial court is prohibited from applying an enhancement factor that is an essential element of the offense. Id. § 40-35-114. Because sexual battery requires that the touching be for the purpose of sexual arousal or gratification, factor (7) is an essential element of the offense. State v. Kissinger, 922 S.W.2d 482, 489-90 (Tenn. 1996). Accordingly, the trial court erred in applying factor (7).

The Appellant also argues that the trial court erred in applying enhancement factor (8), that he, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community, to both of his convictions. See Tenn. Code Ann. § 40-35-114(8). He contends that factor (8) does not apply because he had not yet been sentenced when he fled Shelby County in 2016. The State concedes that applying factor (8) based on his pre-sentencing flight was improper, but argues factor (8) still applies because the Appellant had a prior probation violation. The only probation violation listed in the pre-sentence report, however, was dismissed. The trial court therefore erred in applying factor (8). See State v. Dean, 76 S.W.3d 352, 380 (Tenn. Crim. App. 2001) (concluding that enhancement factor (8) should not have been applied when the alleged parole violation showed no disposition); State v. Evans, No. M2015-00897-CCA-R3-CD, 2016 WL 3992524, at *8 (Tenn. Crim. App. July 21, 2016), no perm. app. filed (concluding that enhancement factor (8) should not have been applied when a condition of bond was violated prior to sentencing).

The Appellant next argues that the trial court erred in applying enhancement factor (5), that he treated a victim with exceptional cruelty during the commission of the offense, to his aggravated sexual battery conviction. See Tenn. Code Ann. § 40-35-114(5). This factor "requires a finding of cruelty over and above that inherently attendant to the crime[.]" State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995). The Appellant contends that his actions "did not demonstrate a level of cruelty above and beyond that which is inherently involved in an aggravated sexual battery." We disagree. The Appellant handcuffed the victim and placed a ball gag in her mouth. He repeatedly choked her until she lost consciousness, allowed her to regain consciousness, then choked her until she lost consciousness again. He taunted her, laughing and telling her she would never see her children again. This cruelty was greater than that inherently involved in an aggravated sexual battery, and the trial court therefore properly applied factor (5).

Lastly, the Appellant argues that the trial court erred in applying enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great, to his aggravated sexual battery conviction. He contends that the victim suffered only bodily

injury, which is an element of the offense. As discussed in Section I.A., however, the victim suffered protracted unconsciousness, which is a serious bodily injury. The trial court therefore properly applied factor (6). See State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994) ("proof of serious bodily injury will always constitute proof of particularly great injury").

Despite the trial court's misapplication of enhancement factors (7) and (8), the court did not abuse its discretion in sentencing the Appellant to the maximum within-range sentences. The court properly applied enhancement factor (1) to the Appellant's especially aggravated kidnapping conviction, and properly applied factors (1), (5), and (6) to the Appellant's aggravated sexual battery conviction. Additionally, the trial court properly applied the purposes and principles of the Sentencing Act. The trial court repeatedly highlighted the seriousness of the offenses and the need to protect society from the Appellant. The trial court expressed concern about the Appellant's potential for rehabilitation, noting that he raped S.N. after the instant offense and failed to acknowledge any wrongdoing. Accordingly, the court did not abuse its discretion.

**B. Consecutive Sentences**. The Appellant argues that the trial court abused its discretion by imposing consecutive sentences. He contends that five misdemeanors over a period of eighteen years, one firearm possession felony, and the alleged criminal behavior against S.N. does not constitute an extensive criminal history. He also contends that: (1) the trial court failed to make the requisite findings to impose consecutive sentencing based on the dangerous offender classification; and (2) the Appellant is not a dangerous offender. The State responds that the trial court did not abuse its discretion because the Appellant has an extensive criminal history and is a dangerous offender.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). When the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, however, this court "should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority." Id. at 863-64. Instead, this court "has two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." Id. at 864.

As relevant in this case, a trial court may order multiple sentences to be served consecutively if it finds by a preponderance of the evidence that "[t]he defendant is an offender whose record of criminal activity is extensive" or "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-

115(b)(2), (4).  When imposing consecutive sentences, the court must still consider the general sentencing principles.  State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).  When imposing consecutive sentences based on the dangerous offender classification, the court must also find that "the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'"  Pollard, 432 S.W.3d at 863 (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)).

A defendant's record of criminal activity is "extensive" if it is "considerable or large in amount, time, space, or scope."  State v. Perry, 656 S.W.3d 116, 128 (Tenn. 2022).  In evaluating whether a defendant's record of criminal activity is extensive, courts should consider the following factors:

(1) The amount of criminal activity, often the number of convictions, both currently before the trial court for sentencing and prior convictions or activity;

(2) The time span over which the criminal activity occurred;

(3) The frequency of criminal activity within that time span;

(4) The geographic span over which the criminal activity occurred;

(5) Multiplicity of victims of the criminal activity; and

(6) Any other fact about the defendant or circumstance surrounding the criminal activity or convictions, present or prior, that informs the determination of whether an offender's record of criminal activity was considerable or large in amount, time, space, or scope.

Id. at 129.  The court's consideration of a defendant's criminal activity is not limited to activity for which the defendant was actually convicted.  See id. (directing courts to consider not just prior convictions, but prior activity).

The trial court did not abuse its discretion by imposing consecutive sentences based on the Appellant's extensive record of criminal activity.  The court noted that the Appellant had a lengthy criminal history that began in 1997.  The Appellant had five prior misdemeanor convictions, eleven misdemeanor charges that did not result in conviction, and a felony conviction.  Before the court for sentencing were two additional felonies.  The court also found that the Appellant raped S.N. after fleeing Shelby County.  The record therefore supports the trial court's finding that the Appellant had an extensive record of criminal activity.  Though the trial court did not specifically make the additional findings

required to classify the Appellant as a dangerous offender, the Appellant's extensive criminal history alone justifies consecutive sentences. See State v. Nelson, 275 S.W.3d 851, 870 (Tenn. Crim. App. 2008) (citing State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997)) ("[A]n extensive criminal history, standing alone, is enough to justify the imposition of consecutive sentencing."). Accordingly, the Appellant is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authorities, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE